UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ex rel. JONATHAN FAULKNER,<br><br>Plaintiff-Relator,<br><br>v.<br><br>THE BOARD OF TRUSTEES OF THE LELAND STANFORD JUNIOR UNIVERSITY,<br><br>Defendant. | Case No. 20-cv-00636-VKD<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS COMPLAINT**<br><br>Re: Dkt. No. 46 |

Plaintiff-relator Jonathan Faulkner filed this qui tam action against The Board of Trustees of the Leland Stanford Junior University ("Stanford"), alleging violations of the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.* Mr. Faulkner's allegations concern the operation and management of a lodging facility for the SLAC National Accelerator Laboratory. Stanford moves pursuant to Rule 12(b)(6) to dismiss the complaint. Dkt. Nos. 46, 56. Mr. Faulkner opposes the motion. Dkt. No. 54. Upon consideration of the moving and responding papers, as well as the oral arguments presented, the Court grants Stanford's motion to dismiss the complaint with leave to amend.[1]

## I.    BACKGROUND

Unless otherwise noted, the following factual allegations are taken from Mr. Faulkner's complaint. Well-pled allegations are accepted as true for purposes of resolving the present motion

---

[1] The United States declined to intervene in this action. *See* Dkt. No. 18. Although it received notice of Stanford's motion to dismiss, the United States did not file any response or state any position with respect to that motion. Nor did the United States appear at the motion hearing.

United States District Court<br>Northern District of California

to dismiss.

The U.S. Department of Energy ("DOE") owns and funds the operation of 17 National Laboratories across the country.  Dkt. No. 1 ¶ 2.  These National Laboratories "address large scale and complex research and development challenges with a multidisciplinary approach that places an emphasis on translating basic science to innovation" and "provide an integrated laboratory network critical to U.S. defense and national security interests."  *Id*.  DOE contracts with various universities and other contractors to operate and manage these Laboratories.  *Id*. ¶ 3.

The SLAC National Accelerator Laboratory ("SLAC")[2] is one of DOE's 17 National Laboratories.  *Id*. ¶ 4.  Since 1962, Stanford has operated SLAC pursuant to a Management and Operating Contract ("M&O Contract")[3] with DOE.  *Id*. ¶¶ 4, 5 & Ex. 1.  SLAC is a Federally Funded Research and Development Center ("FFRDC")[4] located in Menlo Park, California on land owned by Stanford and leased to the United States government.  *Id*. ¶¶ 4, 29 & Ex. 1, § F.4; *see also* App. J at J-M-2.  In general, the M&O states that certain funds are "obligated by the Government with respect to this [M&O] Contract," and Stanford agrees to "provide the personnel, facilities, equipment, materials, supplies, and services (except such facilities, equipment, materials, supplies and services as are furnished by the Government) necessary to perform the requirements and work set forth in this [M&O] Contract" and to "perform such requirements and work in a quality, timely, and cost-effective manner."  *See Id.,* Ex. 1 at §§ B.1. B.2; *see also id.* ¶¶ 30-33.

Sometime in the late 1990s, several decades after Stanford and DOE entered into the M&O

---

[2] SLAC originally was known as the Stanford Linear Accelerator Center.  Dkt. No. 1 ¶ 4.

[3] A "management and operating" contract is defined by regulation as "an agreement under which the Government contracts for the operation, maintenance, or support, on its behalf, of a Government-owned or -controlled research, development, special production, or testing establishment wholly or principally devoted to one or more major programs of the contracting Federal agency."  48 C.F.R. § 17.601.

[4] There appears to be no dispute that an FFRDC refers to a particular class of research facility that "meets some special long-term research of development need which cannot be met as effectively by existing in-house or contractor resources."  48 C.F.R. § 35.017; *see also* Dkt. No. 1, Ex. 1, App. J at J-M-2.

Contract, the SLAC Feasibility Committee determined "that there was high demand for lodging by SLAC users and visitors that was not being met." *Id.* ¶ 45. According to the complaint, "[t]his demand was in part due to the unique nature of the required stay by SLAC users and visitors needed to conduct research at SLAC," which "could last approximately one week up to four months, with a small portion of research lasting up to two years." *Id.*

In 2001, Stanford and DOE entered into a Memorandum of Agreement ("MOA") to "document the understandings between Stanford University and DOE . . . related to the construction and operation of a User Lodging Facility ('ULF') on the DOE Stanford Leasehold." *See id.* Ex. 1, App. M; *see also id.* ¶¶ 35, 53. The MOA provides that "[t]he ULF will be funded by Stanford University, constructed on the DOE Stanford Leasehold site, and operated by Stanford University to the benefit of the DOE and in furtherance of the DOE mission of the Laboratory." *Id.*, Ex. 1, App. M at J-M-2. Stanford agreed "to operate the ULF in accordance with the terms of this MOA for as long as DOE continues its research at the DOE Stanford leasehold." *Id.*, Ex. 1, App. M at J-M-2, J-M-3. In a section of the MOA titled "DOE R[esponsibility]," the MOA states that DOE "authorizes Stanford University to build a ULF on the DOE Stanford Leasehold"[5] and that "[t]he purpose of the ULF is for short term lodging of visiting scientist and staff working on projects/programs at SLAC." *Id.* at J-M-3. A section of the MOA titled "S[tanford] R[esponsibility]" states that Stanford "shall retain ownership and responsibility of the ULF," is "responsible for ensuring that all construction and operations of the ULF comply with all applicable federal, state, and local requirements," and is entirely "responsible for all costs related to the construction, operation, and maintenance of the ULF, which includes but is not limited to general oversight, management, and day to day operations of the ULF." *Id.* at J-M-3.

In a section of the MOA titled "S[tanford] R[epresentations]," the MOA states that Stanford "shall use the revenues generated from room charges to pay-off the ULF construction

---

[5] The MOA says that the DOE's authorization is made "in accordance with Article 9(c) of the Contract." Dkt. No. 1, Ex. 1, App. M at J-M-3. Article 9(c) is not in the record before the Court. As the reference to Article 9(c) appears in a section of the MOA concerning the DOE's responsibility, the contents of that article do not appear to be material for purposes of resolving Stanford's motion to dismiss.

United States District Court
Northern District of California

costs, including interest; the cost of equipping and furnishing the ULF; the cost of operating the ULF; and the costs of all maintenance of and repairs to the ULF[.]" *Id*. at J-M-4. Stanford additionally represented that it would "use its best efforts to obtain a reasonable interest rate to ensure that user-lodging rates remain low" and "shall charge a reasonable rate sufficient to recover operating costs, life cycle maintenance costs, and the amortized construction costs including interest." *Id*. The MOA states that Stanford "anticipates that the ULF daily room charges will be in the $50.00 to $60.00 range"; and that its "investment will be recovered over a thirty-year period from the operating revenues of the ULF." *Id*. With respect to the allocation of rooms at the ULF, Stanford agreed to "refrain from competing with the local hotel industry" and to give "[p]riority allocation" to "SLAC users and DOE reviewers." *Id*. The MOA states that "[i]t is anticipated that room demand associated with SLAC affiliates will more than utilize the available room nights." *Id*. "However, should demand from SLAC affiliates fall short of capacity at any particular time," the MOA provides that Stanford "may utilize this excess capacity to provide short term lodging for individuals associated with other University programs. Under no circumstances will rooms be made available to the public." *Id*. For its part, DOE made "no representations or guarantees respecting the number of users that might now, or in the future, conduct research at SLAC" or "the numbers of users that might use the ULF, or the minimum or maximum occupancy rates that the ULF will experience." *Id*. at J-M-5.

Stanford began construction on the ULF in the early 2000's. The ULF opened in 2003 with 112 guest rooms. Dkt. No. 1 ¶ 46.

Mr. Faulkner was employed by Stanford from September 11, 2006 to January 22, 2019 and was the General Manager of the ULF. *Id*. ¶ 21. He alleges that Stanford violated the False Claims Act by charging rates "beyond the amount necessary to recover the costs associated with the construction and operation of the [ULF]" and "far in excess" of the "$50.00 to $60.00 range" anticipated in the MOA. *Id*. ¶ 9. According to Mr. Faulkner, during the fiscal years 2009 to 2018, Stanford generally charged rates ranging from $75.00 to $200.00, and averaging $115.61, per night. *Id*. ¶¶ 9, 58, 59. He says that the alleged unreasonable charges "have caused the DOE to pay millions of dollars more for lodging for SLAC visitors than the DOE otherwise would have

United States District Court
Northern District of California

1    been responsible for." *Id*. ¶ 10.  At the motion hearing, Mr. Faulkner clarified that he does not

2    contend that it is per se unreasonable for Stanford to charge rates in excess of $60.00 per night, but

3    rather that Stanford may only charge rates that are no greater than what is sufficient to recover the

4    costs described in the MOA.  *See* Dkt. No. 64 at 20:10-21:16.

5        Mr. Faulkner further alleges that Stanford did not give SLAC users and DOE reviewers

6    priority in the allocation of ULF rooms "at all times."  Dkt. No. 1 ¶ 6.  The complaint alleges, on

7    information and belief, that beginning around 2007, Stanford broadened its efforts to open the

8    ULF to non-SLAC users and non-DOE reviewers in "the University's larger community."  *Id*.

9    ¶ 97.  As a result, Mr. Faulkner alleges that in 2015 Stanford "housed approximately 20,135 room

10   nights of non-SLAC visitors at the [ULF]," but "me[t] only 72% of SLAC demand, leaving

11   approximately 28% of all SLAC visitors that desired to stay at the [ULF] unaccommodated."  *Id*.

12   ¶ 107.  He says that "[b]y failing to prioritize SLAC users as required by the MOA, the DOE was

13   forced to incur additional costs to house SLAC users elsewhere in the surrounding area and

14   provide transportation to SLAC."  *Id*. ¶ 111.  At the motion hearing, Mr. Faulkner clarified that

15   Stanford's alleged failure to abide by the priority allocation provision of the MOA is not itself a

16   false claim; rather, he says that the alleged failure to give SLAC users and DOE reviewers priority

17   in the allocation of ULF rooms provides context and shows that Stanford was motivated by profit

18   to avoid what he contends the MOA requires.  *See* Dkt. No. 64 at 32:13-23, 33:2-4.

19       In sum, Mr. Faulkner contends that, contrary to the MOA terms, Stanford charged rates

20   that were more than sufficient to cover the costs identified in the MOA and used the ULF as a

21   profit-generating venture for its own self-interest, while reportedly "hiding the existence of these

22   profits from the DOE . . ."  *Id*. ¶¶ 9, 101-110, 114-118.

23       Mr. Faulkner filed this action, on behalf of the United States, under seal on January 28,

24   2020.  Dkt. No. 1.  His complaint asserts two claims for relief based on the FCA.  The first claim

25   is based on 31 U.S.C. § 3729(a)(1)(A) and alleges that Stanford presented false or fraudulent

26   claims for payment.  The second claim is based on 31 U.S.C. § 3729(a)(1)(B) and alleges that

27   Stanford made or used false records or statements in relation to the claims for payment.  *Id*.

28   ¶¶ 119-128.  After the United States filed a notice declining to intervene in this action (Dkt. No.

United States District Court
Northern District of California

18), on January 8, 2024, the Court ordered this case unsealed and directed Mr. Faulkner to serve Stanford with the summons and complaint.  Dkt. No. 19.  Stanford now moves pursuant to Rule 12(b)(6) to dismiss the complaint, arguing that Mr. Faulkner fails to assert sufficient facts establishing a plausible claim for relief under the False Claims Act.[6]

## II.    LEGAL STANDARD

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the claims in the complaint.  *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001).  Dismissal is appropriate where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable legal theory.  *Id.* (citing *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990)).  In such a motion, all material allegations in the complaint must be taken as true and construed in the light most favorable to the claimant.  *Id.*

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), and "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted).  Moreover, the Court is not required to "'assume the truth of legal conclusions merely because they are cast in the form of factual allegations.'"  *Prager Univ. v. Google LLC* ("*Prager I*"), No. 17-CV-06064-LHK, 2018 WL 1471939, at *3 (N.D. Cal. Mar. 26, 2018) (quoting *Fayer v. Vaughn*, 649 F.3d 1061, 1064 (9th Cir. 2011) (per curiam)).  Nor does the Court accept allegations that contradict documents attached to the complaint or incorporated by reference, *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1115 (9th Cir. 2014), or that rest on "allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences," *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  Although pro se pleadings are liberally construed and held to a less stringent standard than those drafted by lawyers, *see Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), a complaint (or portion thereof) should be dismissed for failure to state a claim if it fails to set forth

---

[6] After Stanford filed its motion to dismiss the complaint, the previously assigned judge recused himself, and the case was reassigned to this Court.  *See* Dkt. Nos. 51, 52.  All parties have expressly consented that all proceedings in this matter may be heard and finally adjudicated by a magistrate judge.  28 U.S.C. § 636(c); Fed. R. Civ. P. 73; Dkt. Nos. 37, 48.

United States District Court
Northern District of California

1  "enough facts to state a claim to relief that is plausible on its face," *Twombly*, 550 U.S. at 570.

2  Documents appended to or incorporated into the complaint or which properly are the

3  subject of judicial notice may be considered along with the complaint when deciding a Rule

4  12(b)(6) motion. *Khoja v. Orexigen Therapeutics*, 899 F.3d 988, 998 (9th Cir. 2018); *Coto*

5  *Settlement v. Eisenberg*, 593 F.3d 1031, 1038 (9th Cir. 2010). A court may take judicial notice of

6  facts that are "not subject to reasonable dispute" because they are "generally known" or "can be

7  accurately and readily determined from sources whose accuracy cannot reasonably be questioned."

8  Fed. R. Evid. 201(b); *see also Khoja*, 899 F.3d at 999. Thus, a court properly may take judicial

9  notice of matters of public record, but cannot take judicial notice of disputed facts contained

10  within such records. *Khoja*, 899 F.3d at 999 (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 689

11  (9th Cir. 2001)).

12  **III.    DISCUSSION**

13      **A.    FCA Pleading Requirements**

14  "The essential elements of an FCA claim are (1) a false statement or fraudulent course of

15  conduct, (2) made with requisite scienter, (3) that was material, causing (4) the government to pay

16  out money or forfeit moneys due." *United States ex rel. Lee v. Corinthian Colls.*, 655 F.3d 984,

17  992 (9th Cir. 2011) (quotations and citation omitted). "Because they involve allegations of fraud,

18  qui tam actions under the FCA must meet not only the requirement of Rule 8, but also the

19  particularity requirements of Rule 9." *Id.*; *see also United States ex rel. Cafasso v. Gen'l*

20  *Dynamics C4 Sys., Inc.*, 637 F.3d 1047, 1054 (9th Cir. 2011) ("The heightened pleading standard

21  of Rule 9(b) governs FCA claims."). "Rule 9(b) provides that '[i]n alleging fraud or mistake, a

22  party must state with particularity the circumstances constituting fraud or mistake.'" *Cafasso*, 637

23  F.3d at 1054-55 (quoting Fed. R. Civ. P. 9(b)). "To satisfy Rule 9(b), a pleading must identify

24  'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or

25  misleading about [the purportedly fraudulent] statement, and why it is false.'" *Id.* at 1055

26  (quoting *Ebeid ex rel. United States v. Lungwitz*, 616 F.3d 993, 998 (9th Cir. 2010)). "It is not

27  enough to allege regulatory violations; rather, the false claim or statement must be the *sine qua*

28  *non* of receipt of state funding." *United States ex rel. Campie v. Gilead Scis., Inc.*, 862 F.3d 890,

899 (9th Cir. 2017) (quotations and citations omitted).  "[B]reach of contract claims are not the same as fraudulent conduct claims, and the normal run of contractual disputes are not cognizable under the FCA." *Cafasso*, 637 F.3d at 1057 (cleaned up) (quotations and citation omitted).

"An FCA claim can proceed under either an express or implied false certification theory." *United States v. McKesson Corp.*, No. 19-cv-02233-DMR, 2020 WL 4805034, at *3 (N.D. Cal. Aug. 18, 2020).  "Express certification simply means that the entity seeking payment certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted." *Ebeid*, 616 F.3d at 998.  Under an implied false certification theory, "when a defendant submits a claim, it impliedly certifies compliance with all conditions of payment." *Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 180 (2016).  "But if that claim fails to disclose the defendant's violation of a material statutory, regulatory, or contractual requirement, so the theory goes, the defendant has made a misrepresentation that renders the claim 'false or fraudulent' under § 3729(a)(1)(A)." *Id.*  The implied certification theory can be a basis for liability under the FCA where (1) "the claim does not merely request payment, but also makes specific representations about the goods or services provided" and (2) "the defendant's failure to disclose noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 190.  At the motion hearing, Mr. Faulkner clarified that he is proceeding on an implied certification theory of liability.  *See* Dkt. No. 64 at 24:21-25:12.

Focusing on the first and third elements of an FCA claim, Stanford argues that Mr. Faulkner has not adequately alleged that Stanford (1) made a false claim to DOE or (2) committed any MOA violations, much less any alleged violations that were material to DOE's decision to pay any claims.

### B.    False Claim

Stanford argues that the complaint should be dismissed because it does not plead with requisite particularity that a false claim was made to DOE.

"It seems to be a fairly obvious notion that a False Claims Act suit ought to require a false claim." *United States ex rel. Aflatooni v. Kitsap Physicians Serv.*, 314 F.3d 995, 997 (9th Cir.

2002); *see also Campie*, 862 F.3d at 899 (stating that "the false claim or statement must be the *sine qua non* of receipt of state funding.") (quotations and citation omitted).  Under the FCA, a "claim" includes "any request or demand, whether under a contract or otherwise, for money or property" that "is presented to an officer, employee, or agent of the United States[.]"  31 U.S.C. § 3729(b)(2)(A)(i); *see also Escobar*, 579 U.S. at 182 (a "claim" under the FCA includes direct requests to the government for payment).  A "claim" also includes "any request or demand, whether under a contract or otherwise, for money or property" that is "made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" and if the United States "provides or has provided any portion of the money or property requested or demanded" or "will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded."  31 U.S.C. § 3729(b)(2)(A)(ii).

"To state an FCA claim, a relator is not required to identify actual examples of submitted false claims; instead, it is sufficient to allege particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted." *Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1209 (9th Cir. 2019) (cleaned up); *see also Ebeid*, 616 F.3d at 998-99 (same).  "A relator is not required to identify representative examples of false claims to support every allegation, although the use of representative examples is one means of meeting the pleading obligation."  *Id*. (citing *Ebeid*, 616 F.3d at 998).

Mr. Faulkner maintains that he has adequately pled the existence of false claims by providing representative examples and explaining the means by which Stanford submitted or caused such false claims to be submitted to DOE.  He refers the Court to the complaint's allegations that Stanford charged unreasonable rates for the ULF, concealed its rate practices from DOE, and used the profits on other non-SLAC University programs.  Dkt. No. 54 at 13-14; Dkt. No. 1 ¶¶ 9; 114-118.  He maintains that this alleged scheme is supported by specific allegations that Stanford "directly overcharged SLAC for approximately 14,130 SLAC visitors between fiscal years 2009 and 2018 alone"; that "an equal, if not greater number of visitors, including DOE reviewers, paid upfront for their own stays at the [ULF] and were overcharged"; that "[t]hese

1    visitors were then later reimbursed by the DOE based upon the excessive and unreasonable rates

2    paid upfront to [Stanford] by the visitors"; and that he "estimates that from fiscal years 2009

3    through 2018 alone, after accounting for all debt service, operation, and management costs

4    actually paid, [Stanford]'s submission of false claims to SLAC and the DOE for reimbursement

5    resulted in approximately $14,653,850 in profits for [Stanford]."  Dkt. No. 54 at 13-14; Dkt. No. 1

6    ¶¶ 66, 68.

7         Several of the allegations Mr. Faulkner cites as supporting the alleged fraudulent scheme

8    are asserted solely on "information and belief."  *See, e.g.,* Dkt. No. 1 ¶¶ 58, 66, 68, 112.  The

9    complaint does not assert the factual basis for these assertions.  Such allegations are not sufficient

10   under Rule 9(b).  *See, e.g., Neubronner v. Milken*, 6 F.3d 666, 672 (9th Cir. 1993) ("[A] plaintiff

11   who makes allegations on information and belief must state the factual basis for the belief.").

12   Citing "a review of the plain language of the MOA," "common sense," and the "presumption of

13   regularity" rule, Mr. Faulkner argues that it may reasonably be inferred that "DOE received the

14   claims and processed such payments to Stanford, unless an evidentiary showing proves

15   otherwise."  Dkt. No. 54 at 15.  Mr. Faulkner's reliance on the presumption of regularity is

16   misplaced, as that rule "supports the official acts of public officers," and, absent clear evidence to

17   the contrary, "presume[s] that they have properly discharged their official duties."  *United States*

18   *v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1926).  The official acts of public officers are not at

19   issue.  Rather, Mr. Faulkner's theory of liability rests on Stanford's alleged breach of the MOA's

20   terms.

21        As noted above, Mr. Faulkner essentially contends that, contrary to the MOA's terms,

22   Stanford used the ULF as a profit-generating venture for its own self-interest and hid the profits

23   from the DOE.  *See* Dkt. No. 1 ¶¶ 9, 101-110, 114-118.  He maintains that the MOA requires

24   Stanford to charge a "reasonable" rate, i.e., a rate that is no more than sufficient to cover the

25   categories of costs referenced in the MOA.  Mr. Faulkner points out that the MOA says that

26   Stanford "shall use the revenues generated from room charges to pay-off" the costs of

27   constructing, equipping, furnishing, operating, maintaining, and repairing the ULF; "will use its

28   best efforts to obtain a reasonable interest rate to ensure that user-lodging rates remain low"; "shall

United States District Court
Northern District of California

charge a reasonable rate sufficient to recover operating costs, life cycle maintenance costs, and the amortized construction costs including interest"; "shall refrain from competing with the local hotel industry"; and would give "[p]riority allocation" of rooms to "SLAC users and DOE reviewers." Dkt. No. 54 at 16; Dkt. No. 1 ¶¶ 38-40, 42, 43. Stanford maintains that Mr. Faulkner's allegations depend on open-ended and discretionary language in the MOA that does not provide a basis for a "false" claim within the meaning of the FCA. *See* Dkt. No. 46 at 5, 11; *see also McKesson Corp.*, 2020 WL 4805034 at \*5 ("The Ninth Circuit has held that when the statutory or contractual requirement underlying an FCA claim contains 'imprecise and discretionary language,' there is only a 'disputed legal issue' rather than an objective statement of fact that can be deemed 'false' under the FCA.") (quoting *Hagood v. Sonoma Cnty. Water Agency*, 81 F.3d 1465, 1477 (9th Cir. 1996)).

To the extent Mr. Faulkner claims that Stanford breached the MOA, and also violated the FCA, by charging rates that were more than sufficient to cover the costs identified in the MOA, the complaint fails to allege a false claim. The MOA does not prescribe specific rates that may be charged, nor does it proscribe increased rates over time. It provides that Stanford must charge "reasonable" rates "sufficient to recover" certain costs, not that the rates charged must be *no greater than* what is sufficient to recover those costs. As currently pled, the complaint does not sufficiently allege the falsity of any statement or claim that was made to DOE, or sufficient facts warranting an inference that false claims were part of the allegedly fraudulent profit-making scheme.

### C.    Materiality

Even assuming the complaint sufficiently pleads a violation of the MOA, Stanford argues that Mr. Faulkner has not sufficiently pled materiality to support an FCA claim. For the reasons discussed below, the Court agrees.

The FCA provides that a misrepresentation is "material" if it "ha[s] a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). "Under any understanding of the concept, materiality look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at

United States District Court
Northern District of California

1    193 (quotations and citation omitted).  "The materiality standard is demanding."  *Id*. at 194.  The

2    FCA "is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of

3    contract or regulatory violations."  *Id*. (quotations and citation omitted).  "A misrepresentation

4    cannot be deemed material merely because the Government designates compliance with a

5    particular statutory, regulatory, or contractual requirement as a condition of payment."  *Id*.  "Nor is

6    it sufficient for a finding of materiality that the Government would have the option to decline to

7    pay if it knew of the defendant's noncompliance."  *Id*.  "Materiality, in addition, cannot be found

8    where noncompliance is minor or insubstantial."  *Id*.

9          Mr. Faulkner maintains that the complaint sufficiently alleges materiality, pointing to

10   allegations that he contends constitute breaches of the MOA, i.e., Stanford charging unreasonable

11   ULF rates, hiding its rate practice from DOE, and not publicly disclosing ULF rates.  *See* Dkt. No.

12   54 at 21-25; Dkt. No. 1 ¶¶ 10, 60, 116-117.  Even assuming that Mr. Faulkner's allegations

13   amount to violations of the MOA, the complaint does not sufficiently plead facts establishing that

14   Stanford's alleged acts were material to its M&O Contract with DOE, or why the FCA is an

15   appropriate means for enforcing alleged breaches of the MOA.  *See Escobar*, 579 U.S. at 194.

16   Although Mr. Faulkner argues that "Stanford knew what was material to the DOE and that it

17   risked the withholding or reducing payment for stays at the [ULF]" (Dkt. No. 54 at 25), the

18   Supreme Court has rejected the idea that "that any statutory, regulatory, or contractual violation is

19   material so long as the defendant knows that the Government would be entitled to refuse payment

20   were it aware of the violation."  *Escobar*, 579 U.S. at 195; *see also id*. at 196 ("The False Claims

21   Act does not adopt such an extraordinarily expansive view of liability.").  In his opposition papers,

22   Mr. Faulkner asserts that the M&O Contract required Stanford to conduct an audit.  *See* Dkt. No.

23   54 at 24 (citing Dkt. No. 1, Ex. 1 at 162).  However, this allegation does not appear in the

24   complaint, and it is not clear what, if any, bearing such a requirement might have on

25   considerations of materiality.  In any event, in his opposition brief, Mr. Faulkner merely asserts,

26   on information and belief, that no such audit was conducted, without providing the factual basis

27   for his belief.

28

United States District Court
Northern District of California

***

Based on the foregoing, the Court concludes that Mr. Faulkner has not sufficiently alleged that Stanford made a false claim to DOE under 31 U.S.C. § 3729(a)(1)(A) or § 3729(a)(1)(B), or that any such claim was material.

## IV.    LEAVE TO AMEND

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend "should be freely granted when justice so requires," and "the court must remain guided by the underlying purpose of Rule 15 . . . to facilitate decision on the merits, rather than on the pleadings or technicalities." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotations and citation omitted). "The decision of whether to grant leave to amend nevertheless remains within the discretion of the district court," which may deny leave to amend if allowing amendment would unduly prejudice the opposing party, cause undue delay, or be futile, or if the party seeking amendment has acted in bad faith. *Leadsinger, Inc. v. BMG Music Publ'g*, 512 F.3d 522, 532 (9th Cir. 2008) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

Mr. Faulkner provided no basis in his opposition papers for the Court to find that there are additional facts that could be alleged on an amendment to support a plausible FCA claim. At the hearing, he indicated that on amendment, he could state a basis for allegations stated on "information and belief" and provide additional information that he believes support his claims. As the law generally favors resolving matters on the merits, the Court exercises its discretion to grant Mr. Faulkner leave to file an amended complaint that addresses the deficiencies discussed in this order.

## V.    CONCLUSION

Based on the foregoing, Stanford's Rule 12(b)(6) motion is granted with leave to amend. If he chooses to file an amended complaint, Mr. Faulkner must do so by **December 20, 2024**.

**IT IS SO ORDERED.**

Dated: December 3, 2024

Virginia K. DeMarchi
United States Magistrate Judge

United States District Court
Northern District of California

13